**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**GARY W. CAMPBELL,**

       **Plaintiff,**

**vs.**                                                                                         **Civ. No. 00-034 JC/RLP**

**KENNETH S. APFEL,
Commissioner of Social Security,**

       **Defendant.**

**UNITED STATES MAGISTRATE JUDGE'S
ANALYSIS AND RECOMMENDED DISPOSITION[1]**

1.      Plaintiff, Gary W. Campbell (Plaintiff herein), filed an application for Supplemental Security Income Benefits (SSI), with a protective filing date of March 19, 1996, alleging that he had been disabled since June 1, 1987.[2] His application was denied at the first and second levels of administrative review (Tr.79-84, 314-321, 358-365), and by an Administrative Law Judge (ALJ herein). (Tr.11-31). The Appeals Council declined to review the ALJ's decision. (Tr.6-7). Plaintiff has filed suit contesting the denial of his claim. The matter is now before the Court on Plaintiff's Motion to Reverse and Remand for rehearing.

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] Plaintiff filed a prior application for SSI benefits on September 13, 1993. That application was denied administratively. The United States District Court, District of New Mexico, subsequently upheld the denial of benefits. (Tr. 138, 140, 146-153). Plaintiff has stipulated that the prior denial is *res judicata* through June 20, 1995.

**I.      Standard of Review**

2.      This Court reviews the Commissioner's decision to determine whether the record contains substantial evidence to support the ALJ's findings, and to determine whether the correct legal standards were applied. **Castellano v. Secretary of Health & Human Services**, 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " **Soliz v. Chater**, 82 F.3d 373, 375 (10th Cir.1996) (quoting **Richardson v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute its discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole. **Dollar v. Bowen**, 821 F.2d 530, 532 (10th Cir.1987).

3.      The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. **Reyes v. Bowen**, 845 F.2d 242, 243 (10th Cir.1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. **Sorenson v. Bowen**, 888 F.2d 706, 710 (10th Cir.1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. Id.

**II.     Vocational and Medical Facts**

4.      Plaintiff was born on August 22, 1946. (Tr. 98). He completed the 10th grade, and obtained a GED. (Tr. 199). He was incarcerated from 1978 until October 1993. (Tr. 116, 199). He has not engaged in any substantial gainful employment since his release from prison. (Tr. 29).

5.      Plaintiff has been an insulin dependent diabetic since age 16. Medical records dating from 1993 document diabetic nephropathy, diabetic retinopathy, cataracts, hypertension, chronic

headaches, sleep disturbance, cystic changes affecting the shoulders, fracture of the left tibia with resultant knee pain, mild hepatitis and/or chronic liver damage attributed to past alcohol abuse and muscular aches and pains. ( See, e.g., Tr. 183-185, 188, 322, 336-338, 370, 373-4, 396).

### III.    Issues Raised by Plaintiff

6.  A.  Whether the ALJ erred in finding that Plaintiff does not suffer from a medically determinable mental impairment;

   B.  Whether the ALJ's finding that Plaintiff's impairment of fibromyalgia is non-severe is supported by substantial evidence;

   C.  Whether the ALJ failed to follow the analysis necessary to support a finding of non-compliance with medical treatment, and

   D.  Whether the ALJ's reliance on the Medical Vocational Guidelines was improper.

### III.    Analysis

   **A.  Substantial evidence supports the ALJ's conclusion that Plaintiff did not establish a medically determinable mental impairment.**

7.   Plaintiff argues that his use of anti-depressant medication and the psychological evaluation by John Owen, PhD., demonstrated the existence of a medically determinable mental impairment, and that the ALJ erred in finding that no mental impairment had been established.

8.   The claimant seeking benefits under the Social Security Act has the burden of proving that he has a "medically determinable" impairment. §42 U.S.C. 423(d)(1)(A). Such an impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3); see also 20 C.F.R.§416.908 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement

3

of symptoms.").

9.      The earliest records related to Plaintiff's mental status are from the University of New Mexico Mental Health Center ("UNMMHC" herein). Plaintiff was seen at UNMMHC on several occasions from January to July 1994, at the request of his parol officer, because of his past history of alcohol abuse.[3] (Tr. 196-200). The counseling staff assigned Plaintiff a "GAF" of 68.[4] (Tr. 200). The counseling records do not document any concern by Plaintiff's mental health care providers of an ongoing mental health condition as of the time he was discharged from care, on or about June 20, 1994. (Tr. 186).

10.     John Owen, PhD., evaluated Plaintiff on July 20, 1995, at the request of Plaintiff's attorney.[5] (Tr. 201-206).  Dr. Owen did not diagnose the presence of a mental disorder, and there is an apparent discrepancy between his narrative conclusions and the conclusions set out in the "Assessment of Ability To Do Work Related Activities (Mental)." For example, in assessing mental status, Dr. Owen described Plaintiff as friendly, cooperative, neat, clean, and possessing adequate social skills adversely affected to "some" extent by his long history of incarceration. He found that Plaintiff understood questions and instructions, exhibited no hallucinations or delusions, was oriented

---

[3] The record establishes that has refrained from alcohol use at all time relevant to the adjudicated period.

[4] The GAF score represents Axis V of the Multiaxial Assessment system. **See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders** 25- 30, (4th ed.1994). The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. See **id**. at 25. The GAF rates the client's "psychological, social, and occupational functioning." Id. at 30. A GAF score of 68 is indicative of "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id. at 32.

[5] This evaluation was also considered in conjunction with Plaintiff's prior application for SSI benefits. (Tr. 151).

to person, time and place, did not report severe depression, had "fine" long term memory and "limited" ability to pay attention and with immediate recall. (Tr. 202). Dr. Owen concluded that Plaintiff had a "good" ability to understand, remember and carry out simple job instructions (Tr. 206), a "fair" (e.g, seriously limited but not precluded) ability to deal with the public, and a "good to fair" ability to use judgment, deal with work stresses, function independently and maintain concentration-attention. Of note, he expressly stated that any diminution in these functions was caused not by a mental condition, but by a physical condition that he had not observed[6], Plaintiff's condition during a diabetic reaction.[7] (Tr. 205).

11.     During the adjudicated period, March 19, 1996 through March 23, 1998, Plaintiff was seen over 60 times at various departments at the University of New Mexico Hospital ("UNMH" herein). At no time was he referred to a psychologist or psychiatrist, nor was a mental condition ever listed as causing or contributing to his complaints[8].  He has been prescribed anti-depressant medications. However, in his case, the medications were prescribed as a sleep aid (Tr. 308) or for head-ache relief (Tr. 375).  Plaintiff points to no record indicating that he was diagnosed as suffering from depression, or that anti-depressant medications were prescribed for complaints other than insomnia and headache.

---

[6] Plaintiff tested his blood sugar during Dr. Owen's exam, and it was normal. (Tr. 202).

[7] The same is true regarding handicaps Dr. Owen assessed in terms of behaving in an emotionally stable manner, relating predictably in social situations and demonstrating reliability. All were limited not by a mental impairment, but by Dr. Owen's assessment of a physical impairment, a diabetic reaction. (Tr. 206-207).

[8] Plaintiff refers to Tr. 416, which he states indicates that an emergency room doctor noted that Plaintiff suffered from depression. Tr. 416 is part of a work-up for an abdominal pain caused by constipation and probable ileus. (Tr. 410-422, 429). Possibly Plaintiff meant to refer to Tr. 460, an out-patient treatment note assessing Plaintiff's diabetes. The examiner noted that Plaintiff had a depressed affect, but no diagnosis of depression was made.

12. Plaintiff himself denied any mental or emotional problems, other than feeling it wasn't right for him to be living with his parents. (Tr. 54). Standing alone, a denial of mental problems is not conclusive evidence of the absence of a mental impairment. Such a denial is properly considered, however, together with the complete absence of a diagnosis of mental impairment in a person who has been seen by counselors, a psychologist and medical doctors.

13. I find that substantial evidence supports the ALJ's conclusion that Plaintiff did not demonstrate the existence of a medically determinable mental impairment.

### B. Substantial evidence supports the ALJ's conclusion that Plaintiff's impairment of fibromyalgia does not meet the 12-month durational requirement of 20 C.F.R. §416.909.

14. Plaintiff challenges the ALJ's finding that his condition of fibromyalgia was not "severe." The ALJ found that Plaintiff did not have a severe impairment relative to a condition of his shoulders or fibromyalgia that met the regulatory 12-month durational requirement of 20 C.F.R. §416.909. (Tr. 18). I find that the record and the law support the ALJ finding.

15. Prior to the adjudicated period, Plaintiff had a history of body-aches diagnosed as fibromyalgia or possible fibromyalgia. (Tr. 178, 278, 244). Testing in September 1995 revealed that he had low magnesium levels, and he was begun on magnesium oxide supplementation. (Tr. 233-234). His pain complaints improved by October 1995. (Tr. 230-231).

16. During the adjudicated period has Plaintiff has made numerous complaints of pain, all of which have been self limited, and do not meet the durational requirement of 20 C.F.R. §416.909[9].

– Complaints of foot pain in May 1996 diagnosed as possible fibroma and ganglionic cysts, treated conservatively. (Tr. 350-352, 349, 310).

---

[9]"Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the durational requirement."

– Complaints of musculoskeletal pain of the left flank in September 1996, treated with Darvocet. (Tr.329-330).

– Complaints of buttock pain caused by a boil, treated and resolved in October 1996). (Tr. 323- 328).

– Complaints of left leg pain and sciatica in October and November 1996, treated with Ibuprofen and Magnesium Oxide. No longer listed as a complaint in January 1997. (Tr. 327-328, 322, 389-391).

– May 7,1997, complaints of increased aches and pains since "backing off" Elavil. (Tr. 373). This notation conflicts with one of the same day, when Plaintiff reported that with Elavil, he had improvement in "all over (?muscle) pain." (Tr. 375).

– Recurrence of musculoskeletal leg pain in August 1997, after Plaintiff had been "non-compliant" with magnesium oxide replacement for a two week period. (Tr. 462). Leg pain was not mentioned in subsequent treatment notes.

– Complaints of "chronic" right sided, lateral musculoskeletal back pain in September 1997. Plaintiff was advised to use an over the counter medication, Advil. (Tr. 504). Plaintiff continued to complain of chronic back pain in October. No findings pertaining to his back were recorded. (Tr. 503). Plaintiff was not seen in November, and had "no complaints" when seen on December 2, 1997. (Tr. 502). He complained of right sided pain on December 8, 1997, which was felt to be due to muscle strain. (Tr. 501).

17. Plaintiff also suffers from chronic headaches, which he contends were a symptom of fibromyalgia, citing to **Weiler v. Shalala**, 922 F. Supp. 689[10] (D. Mass. 1996). If Plaintiff's headaches were a manifestation of fibromyalgia, Plaintiff would meet the durational requirement of 20 C.F.R. §416.909. However, no medical report has associated Plaintiff's headaches with fibromyalgia. Plaintiff complained of chronic headaches in May 1996, brought on by bright sunlight. (Tr. 345-346, 122). He had eyelid surgery in June 1996, which relieved his headache complaints.

---

[10]". . . A person with fibromyalgia can experience chronic aching pain and stiffness, frequently involving the entire body, fatigue, subjective numbness, chronic headaches and irritable bowel syndrome." **Weiler v. Shalala**, 922 F. Supp. 689, 692-93 n.6 (D. Mass. 1996) (quoting the **Attorney's Textbook of Medicine** 176 § 35 (3rd ed. 1995).

(Tr. 336-338, 393-394). Headaches recurred seven months later, in January 1997, and were a continuing complaint until August 1997, when Verapamil was prescribed.[11] From August to December 1997, no complaints of headache were recorded, except for one occasion when Plaintiff admitted that he had not been taking Verapamil.

18.     Clearly, Plaintiff complained of body pain and headaches numerous occasions. His pain complaints resolved with medical treatment. I find that substantial evidence supports the ALJ's determination that Plaintiff did not demonstrate the presence of a severe impairment relative to a

---

[11]*Jan. 29, 1997:* Muscle-tension frontal headache treated with aspirin, Tylenol and occasional Tylenol #3. (Tr. 389-390); *Feb. 17, 1997:* Complaint of chronic headache, severe for the past 2-3 days. Treated with Percocet (Tr. 387-388) and referred for trigger point injections (Tr. 370); *Mar. 26, 1997:* CT scan ordered to evaluate chronic headache (Tr. 381-381) revealed mild volume loss, but no other abnormality (Tr. 379). Roxicet, a pain medication, was prescribed shortly thereafter. (Tr. 486, 484); *April 21, 1997:* Evaluation by neurosurgery department. Plaintiff referred to pain clinic after complaining that Roxicet produced no improvement. (Tr. 484, 373-374); *May 7, 1997*: Referred for trigger point exam/ treatment, with suggestion to check for fibromyalgia trigger points. Started on Depakote and Naprosyn, taken off Roxicet due to potential for rebound headaches. (Tr. 375). *May 14, 1997*: Trigger point injection done, no record of exam for the presence of fibromyalgia trigger points. (Tr. 483); *May 19, 1997*: Refill of prescription for Tylenol #3 for breakthrough headache pain; *May 27, 1997:* Continued complaints of daily tension headaches, not helped by trigger point injections. Referred to neurosurgery department. (Tr. 480); *May 28, 1997*: Continued headache complaints. Advised to taper off Depakote. (Tr. 479). *June 6-7, 1997*: Complaints of headache during hospitalization for abdominal pain. (Tr. 410-458); *June 19, 1997*: Follow-up evaluation for chronic tension headaches. Advised to take Flexeril, Naprosyn and occasional Tylenol #3 for severe pain. (Tr. 478); *July 3, 1997*: Seen in neurosurgery department for complaints of chronic daily headaches for the prior 6 months, not reduced by Flexeril. Plaintiff described as "fairly chronically ill appearing." Flexeril and Amitriptyline discontinued, and Nortriptyline started. Referred for non-pharmacological intervention. (Tr. 475-477). *July 21, 1997:* Complaints of a 7-8 month history of daily headaches. Scheduled for a follow-up neurosurgical exam in September, and placed on Verapamil, for headaches. (Tr. 469, 143); *August 4, 1997*: Outpatient clinic visit for follow up of diabetic condition. Plaintiff stated he was not taking pain medication, and that chronic headaches had improved. (Tr. 466). *August 18, 1997*: Complaints of headache, though admitted not taking Verapamil. Advised to take Verapamil for headaches. (Tr. 462); *September 9, 1997*: Outpatient visit to evaluate diabetes. Headaches not mentioned. (Tr. 460); *September 29, 1997:* Outpatient visit. Headaches not mentioned, though other pain complaints were. (Tr. 504); *October 27, 1997:* Outpatient visit. Headaches not mentioned, though other pain complaints were noted. (Tr. 503); *December 2, 1997:* Outpatient visit for follow up of diabetes. Plaintiff had "no complaints." (Tr. 502). *December 8, 1997:* Outpatient treatment note for a pulled muscle. Headaches not noted. (Tr. 501); *February 5, 1998:* Progress noted signed by Plaintiff ophthalmologist, listing current eye problems, including "severe headaches." This note appears to be a summary of prior records, rather than a current evaluation, as no concurrent examination was recorded. (Tr. 506).

8

condition of his shoulders or fibromyalgia that met the regulatory 12-month durational requirement of 20 C.F.R. §416.909. I also find that the medical evidence did not establish, or even suggest, that Plaintiff's headaches were related to fibromyalgia. As a separate, "severe" impairment, Plaintiff's headaches did not meet the durational requirement of 20 C.F.R. §416.909. Finally I find that Plaintiff's headaches can not be combined with the condition or conditions causing his body aches in order to meet the durational requirement. 20 C.F.R. §416.922(a).

### C. The ALJ properly evaluated Plaintiff's claims of disability due to poorly controlled diabetes.

19. Plaintiff's diabetic condition has frequently been described as poorly controlled. (See e.g., 180, 178, 161, 255, 245, 233, 396, 467, 484, 501-2, 504). The medical record indicates that he has problems with hypoglycemia, or low blood glucose, which can interfere with his functioning. (Tr. 279, 274, 251). Plaintiff contends that the inability to control his blood sugar levels, combined with his inability to sense when he is becoming hypoglycemic, renders him disabled. (Tr. 51; See also Tr. 308).

20. In July of 1995, Plaintiff was keeping a blood glucose journal, and providing it to his health care providers for review. His blood glucose was in normal ranges, and his diabetic condition was described as stable. (Tr. 244; see also, Tr. 202). By October 1995, his blood glucose levels were again described as erratic, and he was given instructions on the timing of self administered blood glucose testing. (Tr. 230). On February 27, 1996, Plaintiff stated that he was not interested in working with a diabetes nurse, clinic or endocrinologist. (Tr. 211). On August 4, 1997, lab testing indicated that Plaintiff had had acute changes in blood sugar. Nonetheless, he refused to see a diabetes nurse, and refused to make any changes in his insulin regimen. (Tr. 466-467). On October 27, 1997, Plaintiff's examining doctor noted that he had been non-compliant in bringing in his blood

glucose journal, and that he again refused to make recommended changes in his insulin regimen. (Tr. 503). On December 8, 1997, Plaintiff again failed to bring his blood glucose journal log to his evaluation. The physician overseeing his care wrote, "Poorly (controlled) IDDM (insulin dependent diabetes mellitus) 2E noncompliance w/ recommendations, will not make changes until blood sugar record reviewed." (Tr. 501).

21. Plaintiff contends that the ALJ erred by failing to follow the analysis required in order to deny a claim based upon non-compliance with medical treatment. Before relying on a claimant's failure to pursue treatment or take medication as support for rejecting allegations of pain, the ALJ should consider "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." **Ragland v. Shalala**[12], 992 F.2d 1056, 1060 (10th Cir. 1993), citing **Frey v. Bowen**[13], 816 F.2d 508 (10th Cir. 1987).

The ALJ noted:

> . . . (T)he medical evidence of record reveals in 1997 Mr. Campbell has sought treatment for complaints of poor control of his blood sugar and acute changes in blood sugar (citation omitted), with low blood sugar reported at least seven times per day in September, 1997 (citation omitted), nonetheless, I note that his health care providers have been suspect of these claims as Mr. Campbell has not complied with bringing in the book in which he records his blood sugars so steps could be taken to

---

[12]In **Ragland**, there was no finding by the ALJ, or any medical evidence upon which to base a finding, that further treatment or medication would benefit claimant at all, much less restore her ability to work. The Court noted that the only professional reference to the matter was an uncritical recitation of the advice the claimant allegedly received from her treating physician following her last surgery that "nothing further could be done." **Ragland v. Shalala**, 922 F.2d at 1060.

[13]In **Frey**, ALJ rejected the claimant's testimony regarding his pain complaints because he did not take pain medication. The Court held that this was error, in view of unrebutted evidence from treating physicians that use of pain medication was contraindicated because of the side effects it would induce. **Frey v. Bowen**, 816 F.2d at 517.

> improve the problem (citation omitted). He also refuses changes in his insulin regime (*sic*) necessary to make changes in his claimed difficulty in control. (citation omitted) The record reveals he has refused to work with a diabetes nurse or endocrinologist (citation omitted) or diabetes counselor (citation omitted). In October and December 1997, he was repeatedly noted to be noncompliant with monitoring of care and physician recommendation for insulin regime (*sic*). . .
>
> * * *
>
> I must accept as fully credible his allegations of extremely labile blood glucose levels that rely entirely on the accuracy of the self monitored diabetes testing. In this regard I have afforded the information provided by Mr. Campbell regarding his limited ability to control his sugar levels, as reflected in his self-monitoring, extremely limited weight. This limited weight is based upon . . . the suspicions documented by his health care providers that have questioned the extent of the lability of his blood glucose given Mr. Campbell has on several occasions refused to change his insulin regime (*sic*), or work with a specialist in the management of the diabetic condition. (citation omitted).
>
> * * *
>
> (W)hile it is apparent Mr. Campbell has solicited opinions from his treating sources to support his claim of disability, none of the treating sources have provided an opinion his condition limits his ability to perform the mental or physical requirements of work activity. (citation omitted).
>
> ***
>
> I am persuaded Mr. Campbell is capable of better control of his blood sugar when he is willing to comply with the recommendations of his treating sources regarding changes in his insulin regimen, particularly if he will work with individuals offered to him that specialize in blood control, such as diabetes counselors, nurses and endocrinologists.

(Tr. 20-21, 26-28).

22. I find that the ALJ adequately considered the factors recited in **Ragland**, and that he relied on substantial evidence in applying the facts of this case to those factors.

**D.     The ALJ's reliance on the Medical Vocational Guidelines was proper.**

23. Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, and requires a good deal of walking, standing, or pushing and pulling when sitting is involved. **West's Social Security Reporting Service, SSR 83-10**, p. 29l 20 C.F.R. §416.967(b). The ALJ found that Plaintiff had the residual functional capacity

for unskilled, light work limited to occasional kneeling, climbing, crawling, balancing, stooping and crouching. (Tr. 28). In making this finding, he relied on the report of a non-examining state agency physician, the report of a consulting physician who examined Plaintiff, and Plaintiff's activities.

24.   Based on a review of the medical records, the state agency physician reported that Plaintiff had the ability to lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk for six hours out of eight, sit for six hours out of eight, and an unlimited ability to operate hand/foot controls, within the weight ranges above. (Tr. 359). He further indicated that Plaintiff had postural limitations, limiting his ability to climb, balance, stoop, kneel, crouch, and crawl to "occasionally"[14]. (Tr. 360). The examining physician stated that Plaintiff could lift 25 lbs occasionally, 15 lbs frequently, could stand or walk for 6 hours in an 8 hour day, up to 1 ½ hours without interruption, and had no sitting restrictions. (Tr. 313-314). Plaintiff has stated that he cares independently for his personal needs and grooming, prepares his meals, helps his parents with dishes and mowing the lawn, can drive a car, can lift 30 pounds frequently, walks one mile per day and bowls once a week. (Tr. 25,49- 51, 58-60, 125, 308).

25.   The ALJ determined Plaintiff's postural limitations (occasional kneeling, climbing, crawling, balancing, stooping and crouching) did not significantly erode the occupational base for light unskilled jobs that Plaintiff could otherwise perform. (Tr. 29-30). He then applied §§202.20 and 202.13 of the Medical-Vocational Guidelines ("Grids"), and determined that Plaintiff was not disabled.[15] Plaintiff does not argue that it was inappropriate to rely on the evaluation of the state agency

---

[14]"'Occasionally' means occurring from very little to up to one-third of the time." **West's Social Security Reporting Service, SSR 83-10**, p. 29.

[15]The ALJ also made findings related to Plaintiff's age, educational level and prior work experience, which are not at issue. (Tr. 29-30).

physician. Rather, he argues that the ALJ erred in utilizing the Grids in light of his postural limitations.

26. The Grids, to be applied automatically, must precisely match the claimant's residual functional capacity, age, education and work experience. **Huston v. Bowen**, 838 F.2d 1125, 1131 (10th Cir. 1988). Certain postural limitations, however, such as the ability to climb, crawl, stoop, and crouch only occasionally, do not significantly limit the occupational base for light work. **West's Social Security Reporting Service SSR 83-14**, at 43-44, 46 (1992).

27. I find that correct legal standards support the ALJ's finding that the ability to kneel, climb, crawl, balance, stoop and crouch only "occasionally" would not significantly compromise the ability to perform light work; that there was substantial evidence to support the finding that Plaintiff could occasionally kneel, climb, crawl, balance, stoop and crouch, and therefore it was not error to rely on the Grids.

### IV.     Recommendation

28. For these reasons, I recommend that the Plaintiff's Motion to Reverse and Remand be denied, and that the decision of the Commissioner, denying Plaintiff's Application for Supplemental Security Income benefits be affirmed.

_____
**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**